UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANDAN PAN, CARRIE HALUZA, CAROLINA DEALY, LAURA PAQUIN, WEI SHI, BLANCHE MATULICH and CONNIE JACOBSON on behalf of themselves and all others similarly situated,<br><br>                                 Plaintiffs,<br><br>v.<br><br>QUALCOMM INCORPORATED &<br>QUALCOMM TECHNOLOGIES, INC.,<br><br>                                 Defendants. | Case No.: 16-cv-01885-JLS-DHB<br><br>**ORDER GRANTING (1) FINAL APPROVAL OF CLASS AND COLLECTION ACTION SETTLEMENT AND (2) MOTION FOR ATTORNEY FEES, COSTS, AND SERVICE AWARDS**<br><br>(ECF Nos. 20, 21) |

       Presently before the Court are Plaintiffs' Motions for (1) Final Approval of Class Action Settlement ("Final Approval Mot."), (ECF No. 20), and (2) Attorney Fees, Expenses, and Service Awards ("Att'y Fee Mot."), (ECF No. 21).[1] Because the settlement is fundamentally fair, reasonable, and adequate, the Court **GRANTS** Plaintiffs' Final

---

[1] Defendant Qualcomm also filed a Motion to File Documents Under Seal ("Mot. to Seal"), (ECF No. 33), in which it seeks to seal the aspects of its filing in support of the Final Approval Motion which "contain private personal and personnel information" on the objectors. (Mot. to Seal 2.) Accordingly, and good cause appearing, the Court **GRANTS** Defendant's Motion to Seal.

Approval Motion. Further, because the requested Attorney Fees, Expenses, and Service Awards are reasonable—especially in light of the tremendous relief Plaintiffs and Plaintiffs' Counsel secured—the Court **GRANTS** Plaintiffs' Attorney Fee Motion in regards to fees and costs. Finally, because each Class Representative provides outstanding service to the class and incurred (and will continue to incur) substantial risk due to their service as a Class Representative, the Court **GRANTS** Plaintiffs' Attorney Fee Motion in regards to all Class Representative Service Awards.

## GENERAL BACKGROUND

Defendant Qualcomm Inc. employs approximately 15,000 individuals in the United States, the majority in San Diego. (December 5, 2016 Order ("Prelim. Settlement Order") 3, ECF No. 17.) Plaintiffs in the above-captioned action have alleged, on behalf of themselves, two classes of similarly situated women, and a collective of similarly situated women, that Defendants Qualcomm Incorporated and Qualcomm Technologies, Inc. (together, "Defendants") have discriminated against female employees in the proposed Classes and Collective. (*Id.*) Together, the proposed classes encompass 3,290 similarly situated female Qualcomm employees in Science, Technology, Engineering, and Math ("STEM") and related production or program management. (*Id.*) Plaintiffs base their claim to relief on the common factual predicate of "systemic gender discrimination as a result of common employment policies, practices, and procedures concerning pay and promotion." (*Id.*)

The Complaint asserts claims for unequal pay and gender discrimination against women regarding compensation, salary increases or raises, job assignments, job code placements, evaluations and ratings, and promotions and demotions, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*; the Equal Pay Act, 29 U.S.C. § 206, *et seq.*; the California Fair Employment and Housing Act, as amended, Cal. Gov. Code § 12940, *et seq.*; the California Equal Pay Act, as amended, Cal. Lab. Code § 1197.5 (amended 2015); the California Business and Professions Code § 17200; and the California Private Attorney General Act of 2004, Cal. Lab. Code § 2698,

*et seq.* (Compl. ¶¶ 93–103, 114–133, 146–65.) In particular, Plaintiffs allege that: (1) Qualcomm's common job leveling and labeling system is flawed such that it is "common for women assigned to lower-paying . . . groups to perform equal work to that performed by men in higher ranking . . . groups[,]" (*id.* ¶ 39); (2) Qualcomm's promotion policies "discrimante[] against and disparately impact[] women" due to a flawed system whereby a majority-male manager set must specifically recommend employees for promotion; and such recommendations are often withheld from women, (*id.* ¶ 40); (3) Qualcomm's employee rating system encourages ranking primarily based on "qualitative . . . rather than quantitative measures" such that the system "disparately impacts and promotes a pattern and practice of discrimination against women in ratings[,]" (*id.* ¶ 41); and (4) the combination of (1)–(3) above, in addition to the fact that "women in the same rewards groups and job codes start with lower average salaries than their male counterparts in the same job codes and rewards groups," results in the system "discriminat[ing] against and disparately impact[ing] women[,]" (*id.* ¶ 42).

Plaintiffs also allege discrimination based on pregnancy, childbirth, and related medical conditions in violation of Title VII of the Civil Rights Act of 1964, including the Pregnancy Discrimination Act, as amended, 42 U.S.C. § 2000e, *et seq.*, and the California Fair Employment and Housing Act, as amended, including the Pregnancy Disability Leave Law and the California Family Rights Act, Cal. Gov. Code § 12940, *et seq.*, and violation of California caregiver laws with respect to leave provisions for care of a child (including newborn biological, adopted, foster, and step children, and any child for whom the woman serves *in loco parentis*) in violation of the California Fair Employment and Housing Act, as amended, including the California Family Rights Act and the California Pregnancy Disability Leave Law, Cal. Gov. Code § 12940, *et seq.* (Compl. ¶¶ 104–13, 134–45.) In particular, Plaintiffs allege that "Qualcomm maintains common policies with respect to caregivers and protected leave to care for a newborn, child, adopted child, or foster child" that "stigmatize employees with caregiving responsibilities and disproportionately penalize women." (*Id.* ¶ 43.) These policies include: (1) "an unwritten policy of 24-7 availability[;]"

(2) a flawed proration policy for employees on "part-time or flex-time schedule" that does not account for quality or quantity of the work the employee produces; and (3) "an unwritten policy of disparately rewarding employees who work late into the night over employees who choose to arrive early and leave at the end of a normal work-day." (*Id.*) Plaintiffs further allege that together these "policies stigmatize employees with caregiving responsibilities and disproportionately penalize women." (*Id.*)

Plaintiffs and Defendants ("the Parties") entered into extensive pre-suit negotiations for the purpose of settling their disputes, including (1) voluntary exchange of information, including three sets of "class-wide pay and promotion data concerning all Qualcomm employees" relevant to this action; (2) expert statistical analyses by both Parties regarding these data sets; and (3) attending two full days of mediation in San Francisco with David Rotman of Gregorio, Haldeman & Rotman.[2] (Prelim. Settlement Order 4.) Despite the initial mediation being unsuccessful and the fact that "Qualcomm has consistently denied any wrongdoing and has denied all of Plaintiffs' individual and class allegations[,]" the second mediation and subsequent negotiations have been successful. (*Id.*) Although Qualcomm maintains its complete denial of wrongdoing, the parties have agreed to the entry of a proposed Collective and Class Action Settlement Agreement ("Settlement Agreement") as a full settlement of these disputes and this legal action, subject to the Court's final approval. (*See generally id.*)

On December 4, 2016, the Court issued an Order (1) granting preliminary approval of class action/collective action settlement; (2) provisionally certifying settlement classes and collective action; (3) appointing class counsel; (4) appointing Plaintiffs as Class

---

[2] The legal dispute began in October 22, 2015 when Plaintiff Dandan Pan filed an initial Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Complaint of Discrimination with the California Department of Fair Employment and Housing ("DFEH"). (Prelim. Settlement Order 4 n.1.) By November 7, 2015 class counsel had discovered new claimants and notified Qualcomm of additional draft EEOC charges they planned to file. (*Id.*) Qualcomm and Plaintiffs agreed to delay in filing these additional EEOC charges "in anticipation of engaging in substantive settlement negotiations." (*Id.*)

Representatives; (5) appointing Rust Consulting as Class Administrator; (6) approving notice and directing distribution of Notice; and (7) setting the schedule for the final approval process. (*See generally id.*) Since that time, "the Class Administrator sent Notice to 3,483 Class Members" in "the form approved by the Court[,]" (*id.* at 1), and, in accordance with the schedule, Plaintiffs submitted their Final Approval Motion and Attorney Fee Motion. Additionally, approximately one month after Plaintiffs submitted to the Court their Final Approval Motion, the Claims Administrator received four objections to the settlement, (Medina Decl. Exs. 1–4, ECF No. 29).

The Court conducted a Final Approval Hearing on March 13, 2017. (*See* ECF No. 39.) No objector appeared at the hearing. However, the Parties sought "leave to add . . . to the list of positions covered by the Settlement" three job codes that "were inadvertently omitted from the Appendices of covered positions." (Suppl. Br. in Supp. of Final Approval of Class Action Settlement 2, ECF No. 31.) The Court granted the request, (*see* ECF No. 45), and the Claims Administrator mailed updated Notice documents to the newly added class members, (Suppl. Decl. of Abigail Schwartz in Supp. of Final Approval ("Schwartz Decl.") ¶ 4, ECF No. 46.) No mailing was returned undeliverable, and the updated Notice yielded no further objections or requests for exclusion. (*Id.* ¶¶ 4–5.)

## SETTLEMENT TERMS

The parties have submitted a comprehensive settlement document with approximately thirty-five pages of substantive terms and a twenty-four-page appendix outlining "Exempt Job Codes in Covered Positions." (Settlement Agreement, ECF No. 6-1.) The settlement provides two primary forms of relief: (1) monetary and (2) programmatic. The settlement continues to have the support of each of the seven class representatives. (Medina Decl. Exs. 1–7, ECF Nos. 21-3 to -9.)

## I.    Monetary Relief

Qualcomm is required to make a non-reversionary settlement payment of $19.5 million in settlement of all class and collective claims in the case (the "Fund"). (Settlement Agreement § 1.27.) Individualized award payments will be disbursed from the Fund based

on a formula applied to each member of the classes based on "each Class Member's individual rate of pay and length of employment within the applicable Class Period, as well as whether she has previously signed a release or whether she took pregnancy related leave to care for a newborn." (Final Approval Mot. 15 (citing Settlement Agreement § 5.3).) Assuming the Court does not deviate from proposed settlement or requested attorney fees and service awards, the average pre-tax recovery for class members will be approximately $3,771.32. (*Id.*) Finally, pursuant to the Fund's *cy pres* provisions, any balance remaining in the Fund after all recovery is issued and the class period has closed will be donated to Lesbians Who Tech, and any balance remaining due to uncashed checks will be divided evenly between the Association for Women in Science and the Center for WorkLife Law. (*Id.* at 15 n.18 (citing Settlement Agreement § 18).)[3]

## II. Programmatic Relief

The parties outline extensive programmatic relief and estimate that the monetary value of such relief to the class is "at least an additional $4,000,000." (*Id.* at 15–16; Medina Decl. ¶ 66.) The programmatic relief encompasses, but is not limited to: (1) appointing an independent Compliance Officer to monitor compliance with the terms of the settlement, including (a) meeting for biannual review with the CEO and the head of Human Resources, (b) meeting for annual review with any persons in a position of Senior Director or higher who manage employees in the United States, and (c) reviewing biannual employee reports; (2) within ten days of the settlement taking effect, appointing independent consultants to structure job interviews and work policies to avoid future compliance issues; (3) setting up an anonymous toll-free twenty-four-hour telephone complaint line; (4) creating a complaint database and resolution mechanisms such as investigator and written communications protocols to be used in addressing complaints; (5) collecting and

---

[3] Plaintiffs move the Court for "leave to add job codes 2249, 3246, and 5115 to the list of positions covered by the Settlement." The Settlement Agreement explicitly contemplates such an addition. (Settlement Agreement apps. 1, 2.) Accordingly, and good cause appearing, the Court **GRANTS** leave to add these three job codes.

16-cv-01885-JLS-DHB

analyzing data regarding promotion rates and potential gender disparities; (6) outlining potential disciplinary actions for employee breach of these updated policies; and (7) understanding and adopting improved practices regarding maternal and parental leave. (Settlement Agreement § 3 (comprising pages 7–18 of Settlement Agreement).)

## RULE 23 SETTLEMENT CLASS CERTIFICATION

Before granting final approval of a class action settlement agreement, the Court must first determine whether the proposed class can be certified. *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997) (indicating that a district court must apply "undiluted, even heightened, attention [to class certification] in the settlement context" in order to protect absentees). In the present case, the Court previously provisionally certified the settlement class for purposes of settlement only. (Prelim. Settlement Order 6–12.) "In the interim, nothing has changed to affect the propriety of certification of the Classes." (Final Approval Mot. 18–20.) Accordingly, the Court's analysis here is largely the same as in its Preliminary Settlement Order.

Class actions are governed by Federal Rule of Civil Procedure 23. In order to certify a class, each of the four requirements of Rule 23(a) must first be met. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Rule 23(a) allows a class to be certified only if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Next, in addition to Rule 23(a)'s requirements, the proposed class must satisfy the requirements of one of the subdivisions of Rule 23(b). *Zinser*, 253 F.3d at 1186. Here, Plaintiffs seek to certify the Settlement Class under subdivision Rule 23(b)(3), which permits certification if "questions of law or fact common to class members predominate

7

over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Plaintiffs further seek to certify a subclass under Rule 23(b)(2) comprised of all current Qualcomm employees within the larger class. Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The Court addresses each of these requirements in turn.

## I. Rule 23(a)(1): Numerosity

Federal Rule of Civil Procedure 23(a)(1) requires that a class must be "so numerous that joinder of all members is impracticable." "[C]ourts generally find that the numerosity factor is satisfied if the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer." *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007).

Here, the proposed Settlement Class consists of approximately 3,483 members. (Final Approval Mot. 19; *see* Medina Decl. ¶ 18, ECF No. 20-2.) Further, because the majority of Qualcomm employees are in San Diego, the California subclass constitutes well over 40 members. Accordingly, joinder of all members would be impracticable for purposes of Rule 23(a)(1), and the numerosity requirement is therefore satisfied.

## II. Rule 23(a)(2): Commonality

Federal Rule of Civil Procedure 23(a)(2) requires that there be "questions of law or fact common to the class." Commonality requires that "the class members 'have suffered the same injury.' " *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

Here, the parties have carefully defined the Settlement Class to encompass all Qualcomm employees adversely affected by the alleged discriminatory policies and

practices set forth above. (Compl. ¶¶ 49–53.) All common questions thus revolve around whether the alleged discriminatory policies and practices in fact were discriminatory and disparately impacted the class members. Additionally, the California subclass is merely a geographical subset of Qualcomm employees that had the same potential to be adversely affected by the relevant policies. Accordingly, it is appropriate for these issues to be adjudicated on a class-wide basis, and Rule 23(a)(2) is satisfied.

## III.    Rule 23(a)(3): Typicality

To satisfy Federal Rule of Civil Procedure 23(a)(3), Plaintiffs' claims must be typical of the claims of the Class. The typicality requirement is "permissive" and requires only that Plaintiffs' claims "are reasonably coextensive with those of absent class members." *Hanlon*, 150 F.3d at 1020. "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). "[C]lass certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.' " *Id.* (citation omitted).

Here, Plaintiffs all were or are Qualcomm employees whose claims allegedly arise out of the same underlying Qualcomm policies and practices as those pertaining to the proposed Settlement Class and the California subclass. (Final Approval Mot. 21–22; Compl. ¶¶ 4–17.) Accordingly, Plaintiffs' claims are typical of the claims of the members of the proposed Settlement Class and the California subclass, thus satisfying Rule 23(a)(3).

## IV.    Rule 23(a)(4): Adequacy

Federal Rule of Civil Procedure 23(a)(4) requires that the named representatives fairly and adequately protect the interests of the class. "To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of judgment which binds them." *Hanlon*, 150 F.3d at 1020 (citing *Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940)). To determine legal adequacy, the Court must resolve two

9

questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.*

Here, there is no reason to believe that the named representatives and Class Counsel have any conflict of interest with the proposed Settlement Class members. There is also no reason to believe that the named representatives and Class Counsel have thus far failed to vigorously investigate and litigate this case. Plaintiffs have retained competent counsel, who has conducted extensive investigation, research, and informal discovery in this case. (Final Approval Mot. 7–10.) Almost all of the named representatives, at their own expense, attended the mediation sessions in San Francisco, and together have expended "well over 1,700 hours in service to the Classes." (*Id.* at 10–12.) Furthermore, Class Counsel has significant class action litigation experience—especially regarding gender discrimination—in state and federal court. (*Id.* at 22, 28–29.) Accordingly, the named representatives and Class Counsel adequately represent the proposed Settlement Class members, and Rule 23(a)(4)'s adequacy requirement is met.

## V.  Rule 23(b)(3)

Federal Rule of Civil Procedure 23(b)(3) permits certification if "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### A.  *Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. "Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022.

Here, the common issue of whether Defendant's policies and practices discriminated against women predominates over the individual issues such as length of employment and particularized childcare or caretaker responsibilities. (*See* Final Approval Mot. 23–24.)

Further, for purposes of settlement, Class Members are not required to prove any evidentiary or factual issues that could arise in litigation. Accordingly, the predominance requirement of Rule 23(b)(3) is satisfied.

### B.    Superiority

The final requirement for certification pursuant to Federal Rule of Civil Procedure 23(b)(3) is "that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." The superiority inquiry requires the Court to consider the four factors listed in Rule 23(b)(3):

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

*See also Zinser*, 253 F.3d at 1190. A court need not consider the fourth factor, however, when certification is solely for the purpose of settlement. *See True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1066 n.12 (C.D. Cal. 2010); *see also Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."). The superiority inquiry focuses " 'on the efficiency and economy elements of the class action so that cases allowed under [Rule 23(b)(3)] are those that can be adjudicated most profitably on a representative basis.' " *Zinser*, 253 F.3d at 1190 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1780, at 562 (2d ed. 1986)). A district court has "broad discretion" in determining whether class treatment is superior. *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975).

Here, Class Members' claims involve the same issues arising from the same factual bases. If Class Members' claims were considered on an individual basis, over 3,400 cases

would follow a similar trajectory, and each would come to a similar result. Furthermore, individual cases would consume a significant amount of the Court's and the Class Members' resources. It is also likely that Class Members would not pursue litigation on an individual basis due to the high costs of pursuing individual claims, nor would Defendants likely be willing to accept programmatic relief on the scale secured in the settlement. The interests of the Settlement Class Members in individually controlling the litigation are minimal, especially given the same broad-based policy and practices would be at issue. Additionally, because the majority of Qualcomm's employees are located in San Diego, many of the individual cases would likely be filed in this district, and thus it is desirable to concentrate the litigation in a single forum. Given all of the above, class treatment is the superior method of adjudicating this controversy, and the superiority requirement of Rule 23(b)(3) is met.

## VI.    Rule 23(b)(2)

Unlike Federal Rule of Civil Procedure 23(b)(3) which is appropriate for "individualized monetary claims," "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360–62 (quotation marks omitted). Additionally, "[b]ecause the relief requested in a (b)(2) class is prophylactic, enures to the benefit of each class member, and is based on accused conduct that applies uniformly to the class, notice to absent class members and an opportunity to opt out of the class is not required." *Aho v. AmeriCredit Fin. Servs., Inc.*, 277 F.R.D. 609, 615 (S.D. Cal. 2011).

In the present case, Plaintiffs seek to certify a (b)(2) subclass comprised of members of the Settlement Class who are still employed by Qualcomm. Plaintiffs seek to certify this subclass only for the purposes of the programmatic relief portion of the Settlement because the proposed programmatic relief will apply with equal force to all continuing and future employees of Qualcomm. (*See* Final Approval Mot. 24–25, 33.) Defendants have denied and continue to deny any wrongdoing, Plaintiffs' allegations, and that Plaintiffs would be

12

able to certify a class action absent the settlement. Accordingly, certification of the current-employee subclass under Rule 23(b)(2) is proper for purposes of the programmatic relief portion of the settlement.

## VII. Conclusion

For the reasons stated above, the Court finds certification of the Settlement Class proper under Rule 23(b)(3) and certification of the Current-Employee subclass proper under Rule 23(b)(2). Accordingly, the Court **REAFFIRMS** certification of the Settlement Class and the Current-Employee Subclass for settlement purposes only.

## EPA COLLECTIVE ACTION CERTIFICATION

The Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, as amended by the Equal Pay Act, 29 U.S.C. § 206, *et seq.*, authorizes workers to sue for gender–pay-based discrimination on behalf of themselves and "other employees similarly situated." 29 U.S.C. § 216(b); *see id.* § 206(d). Unlike class actions brought under Federal Rule of Procedure 23, however, collective actions brought under the FLSA require that individual members "opt in" by filing a written consent. *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."). Accordingly, collective active certification under the FLSA is subject to a less stringent standard than that imposed by Federal Rule of Civil Procedure 23 regarding class actions. *See, e.g.*, *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1009 (N.D. Cal. 2010); *Hensley v. Eppendorf N. Am., Inc.*, No. 14-CV-419-BEN NLS, 2014 WL 2566144, at *3 (S.D. Cal. June 6, 2014).

Although the Ninth Circuit has not directly addressed the appropriate FLSA certification procedure for whether parties seeking certification are "similarly situated," district courts in this circuit have used an *ad hoc*, two-tiered approach. *See, e.g.*, *Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1082 (C.D. Cal. 2002) (noting that the majority of courts prefer this approach). The court first makes an initial "notice stage" determination as to whether plaintiffs are similarly situated, deciding whether a collective action should be certified for the purpose of sending notice of the action to potential class members. *See,*

*e.g.*, *Hill*, 690 F. Supp. 2d at 1009. A plaintiff must show substantial allegations, supported by declarations or discovery, that "the putative class members were together the victims of a single decision, policy, or plan." *Id.* The standard for certification at this stage is a lenient one that typically results in certification. *Id.* (citing *Wynn*, 234 F. Supp. 2d at 1082).

The second determination is made after notice is given, and "the court reviews several factors, including the disparate factual and employment settings of the individual plaintiffs; the various defenses available to the defendant which appear to be individual to each plaintiff; fairness and procedural considerations; and whether the plaintiffs made any required filings before instituting suit." *Id.* at 1009 (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001).

In the present case, Plaintiffs' requested EPA collective action arises from the same factual circumstances underlying the previously discussed Rule 23 classes; i.e., the allegedly discriminatory Qualcomm policies and practices. Because all putative class members are seeking relief from these same policies and practices, the putative class members are "similarly situated" for purposes of the EPA collective action. Further, in the present case each Class Member is both a member of the EPA collective action and the Rule 23 class. And although EPA collective actions are subject to less stringent approval standards than Rule 23 classes, this means that each collective-action member received Rule-23 compliant notice and the opportunity to appear at the final fairness hearing; protections that need not necessarily be included in an EPA collective action. Accordingly, collective action certification is appropriate. *See supra* 6–13.

## RULE 23 FINAL APPROVAL DETERMINATION

Having certified the Settlement Class, the Court must next determine whether the proposed settlement is "fair, reasonable, and adequate" pursuant to Federal Rule of Civil Procedure 23(e). Relevant factors to this determination include:

> The strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery

14

completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026. Furthermore, due to the "dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court designated class representative," any "settlement approval that takes place prior to formal class certification requires a higher standard of fairness." *Id.*

## I. Strength of Plaintiffs' Case

In order to succeed on the merits, Plaintiffs would have to prove that Defendant's practices and policies were discriminatory. (Compl. ¶¶ 93–165.) Qualcomm steadfastly denies any wrongdoing, that Plaintiffs are entitled to any relief at law or equity, and that Plaintiffs would be able to validly certify a class in the absence of the settlement agreement. (*See* Defs.' Answer to Class and Collective Action Compl. 44, ECF No. 10.) Given this juxtaposition, and that the sometimes-nebulous issue of what constitutes legally or equitably cognizable discrimination would likely be hotly contested in litigation, *see generally, e.g.*, Michael Selmi, *Was the Disparate Impact Theory a Mistake?*, 53 UCLA L. Rev. 701, 738–53 (2006) (discussing results of empirical study evaluating success of disparate-impact Plaintiffs in federal court), the Court thus finds that this factor weighs in favor of the $19.5 million settlement and corresponding programmatic relief being fair, reasonable, and adequate. *See, e.g.*, *Bond v. Ferguson Enters., Inc.*, No. 1:09-CV-01662, 2011 WL 284962, at *7 (E.D. Cal. Jan. 25, 2011) ("Even if Plaintiffs were to prevail, they would be required to expend considerable additional time and resources potentially outweighing any additional recovery obtained through successful litigation.").

## II. Risk, Expense, Complexity, and Likely Duration of Further Litigation

Were the case to proceed to further litigation rather than settlement, the parties would each bear substantial risk and a strong likelihood of protracted and contentious litigation. Even though the parties have agreed to settle this action, they fundamentally disagree

regarding the validity of Plaintiffs' claims, and have already produced competing expert testimony allegedly strongly supporting each party's respective position. (Final Approval Mot. 8–9.) Additionally, Plaintiffs' Counsel estimate that they have thus far spent over 3,084 attorney and staff hours in pursuing the proposed settlement, (Att'y Fee Mot. 2), and the fact that Defendant disputes all aspects of Plaintiffs claims, including the propriety of class certification in the absence of the settlement agreement, suggests that these issues would be vigorously (and therefore costly) litigated were there to be further litigation. Given the foregoing, this factor weighs in favor the settlement being fair, reasonable, and adequate.

## III. Risk of Maintaining Class Action Status Throughout Trial

The Parties dispute whether the classes can be validly certified in the absence of the Settlement Agreement. (Final Approval Mot. 32.) Implicit in this disagreement is the likelihood of initial challenges to class certification and the potential for decertification motions even if class status is granted. Additionally, Plaintiffs acknowledge that class certification is not guaranteed, especially in the wake of *Wal-Mart Stores, Inc. v. Dukes et al.*, 131 S. Ct. 2541 (2011), and often-diverging lower-court interpretations of the same. (Final Approval Mot. 32.) Weighed against the fact that Defendants do not object to a finding that the class elements are met for purposes of this settlement, this factor also weighs in favor of the settlement being fair, reasonable, and adequate. *E.g.*, *Couser v. Comenity Bank*, 125 F. Supp. 3d 1034, 1042 (S.D. Cal. 2015) ("Where there is a risk of maintaining class action status throughout the trial, this factor favors approving the settlement." (citation omitted)).

## IV. Amount Offered in Settlement

The crux of Plaintiffs' claims is that Qualcomm's allegedly discriminatory policies and practices led to the class members being less-gainfully employed than their male counterparts. Thus, proof of damages will in part necessarily turn on certain subjective considerations, such as whether class members would have been promoted but for the allegedly discriminatory policies and practices. This in turn makes damage calculations

uncertain. Nonetheless, Class Counsel estimates—based on their expert's analysis—that "the approximately $13 million Settlement Awards Fund represents more than 84% . . . of the Classes' total actual lost base[-]pay compensation." (Final Approval Mot. 33.) Given this uncertainty were the case to proceed unsettled, and that the average pre-tax recovery for class members will be approximately $3,771.32 and such a high percentage of the actual lost base-pay compensation, this factor weighs in favor of the settlement being fair, reasonable, and adequate. *See, e.g.*, *Bennett v. SimplexGrinnell LP*, No. 11-CV-01854-JST, 2015 WL 1849543, at *7 (N.D. Cal. Apr. 22, 2015) ("The Court finds that the class members' net recovery of at least . . . approximately thirty percent of the maximum exposure figure . . . is fair, reasonable, and adequate . . . .").

## V.    Extent of Discovery Completed and Stage of Proceedings

Prior to the agreed-upon settlement, the parties engaged in substantial discovery, including compiling three data sets regarding all relevant class members, performing multiple expert analyses on these data, and engaging for two sessions a neutral third-party mediator who fully examined and discussed with each party the strengths and weakness of each party's case.  (Final Approval Mot. 7–10.) Both Class Counsel and Defense Counsel gained significant knowledge of the relevant facts and law throughout the discovery process and through independent investigation and evaluation. Accordingly, it appears both parties have entered into the settlement agreement with a strong working knowledge of the relevant facts, law, and strengths and weaknesses of their claims and defenses. Given all of the above, this factor weighs in favor of the proposed settlement being fair, reasonable, and adequate. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as amended* (June 19, 2000) (upholding district court finding and explaining that in the absence of formal discovery this factor turns on whether "the parties have sufficient information to make an informed decision about settlement").

## VI.    Experience and Views of Counsel

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979). And here,

Class Counsel believes the Settlement Agreement is fair, reasonable, and adequate and in the best interest of the Settlement Class. (Final Approval Mot. 35.) Furthermore, in the present case the presumption of reasonableness is especially warranted based on Class Counsel's expertise in complex litigation, familiarity with the relevant facts and law, and significant experience negotiating other class and collective action settlements. Given the foregoing, and according the appropriate weight to the judgment of these experienced counsel, this factor weighs in favor the proposed settlement being fair, reasonable, and adequate.

## VII. Class Member Objections

Of the approximately 3,483 class members, four members—or 0.11%—have filed written objections to the settlement ("Objs."). (ECF No. 29.) Specifically, the four written objections together raise the following alleged deficiencies regarding the settlement: (1) the release is overly broad, (Objs. Exs. 1–3); (2) the settlement does not adequately compensate certain workers for the individualized discrimination they suffered and period of time they worked, (*id.* Exs. 1–4); (3) the settlement does not address promotion denials, (*id.* Exs. 1–2); and (4) the settlement does not permanently address how gender discrimination in compensation and promotions will be addressed and measured in the future, (*id.* Ex. 1). At the request of the Court, Plaintiffs have responded to these objections ("Obj. Response"). (ECF No. 31.) After considering both sides' positions, the Court **OVERRULES** the objections.

"Generally, 'the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members.' " *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2011 WL 1230826, at *11 (N.D. Cal. Apr. 1, 2011) (quoting *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004)). And this presumption is especially warranted in the present case where many of the objections focus on issues individualized to the specific Objectors. Further, the objections here that are general to all class members are not significant enough to bar final approval. Courts routinely grant final

settlement approval in cases where class members waive claims through the date of Final Approval. *E.g.*, *Wren*, 2011 WL 1230826, at *5 n.2 (granting final approval where class members waived claims "through the date that the Court enters a final order granting final approval of the settlement"). And although the Settlement Agreement does not address all potential discrimination that employees at Qualcomm might ever again face, the Settlement does include substantial programmatic relief that will require changes in workplace policy and complaint recognition, all to be monitored by an independent source. (*See generally* Settlement Agreement § 3.) Accordingly, these generalized objections are insufficient to bar final approval.

Finally, insofar as the individualized objections raise any general concerns about the terms of the settlement, these objections also should not bar final approval. Although individual Objectors argue that the Settlement does not adequately compensate them for their particular length of employment, the Settlement Agreement does take into account, in a very detailed manner, the individual job codes and length of employment for each class member. (*E.g.*, *id.* § 5.3.) Additionally, the Settlement addresses denied promotions by approximation through higher remuneration for class members who took leave for pregnancy or care of a newborn. (*Id.* § 5.3.4.) And to the extent that any of the Objectors feel that the Settlement Agreement does not adequately address their specific circumstances, the more appropriate course of action is for these Objectors to opt out of the class, rather than bar final approval of a settlement where 3,466 of 3,483 class members find the Settlement to be in their best interest. *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming final approval where approximately 0.61% of class members either opted out or objected).

In sum, the Court **OVERRULES** the four Objectors' set of objections as raising concerns that are either (1) already adequately addressed by the Settlement Agreement or (2) specific to the individual Objectors such that they do not raise a genuine concern as to all Class Members.

/ / /

## VIII. Conclusion

For the reasons stated above, the Court **GRANTS** Plaintiffs' Final Approval Motion regarding the Rule 23 Settlement.

## EPA COLLECTIVE FINAL FAIRNESS DETERMINATION

Given the FLSA's underlying policy to ensure that an employee's right to fair payment cannot be waived nor diminished by contract, any settlement of an FLSA collective action requires the supervision of either the Secretary of Labor or the district court. *See, e.g.*, *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352–53 (11th Cir. 1982) (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706–07 (1945)). However, unlike analysis concerning whether a proposed settlement is fair, reasonable, and adequate under Rule 23, the Ninth Circuit has not provided explicit direction for assessing the fairness of a proposed EPA settlement. *See, e.g.*, *Gamble v. Boyd Gaming Corp.*, No. 2:13-CV-01009-JCM, 2015 WL 4874276, at \*4 (D. Nev. Aug. 13, 2015). Most district courts in the Ninth Circuit assess whether "the settlement reflects 'a reasonable compromise' over issues that are 'actually in dispute.' " *Id.* (quoting *Lynn's*, 679 F.2d at 1354). As with class certification, the FLSA standard sets a lower threshold than the corresponding Rule 23 requirements. *See id.* at \*13.

In the present case, because the Settlement Agreement passes muster under Rule 23 analysis, it also passes the "reasonable compromise" standard governing EPA collective actions. As set forth above in the Court's Rule 23 analysis, this case reflects careful legal and factual analysis by the parties of issues actually in dispute and a correspondingly carefully crafted Settlement Agreement that takes into account those same analyses. Accordingly, the Court **GRANTS** Plaintiffs' Final Approval Motion regarding the EPA Collective Action Settlement.

## ATTORNEY FEE AND COST AWARD

In the Ninth Circuit, a district court has discretion to apply either a lodestar method or a percentage-of-the-fund method in calculating a class fee award in a common fund case. *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002). When

applying the percentage-of-the-fund method, an attorney fee award of "twenty-five percent is the 'benchmark' that district courts should award . . . ." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (citing *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)); *Fischel*, 307 F.3d at 1006. However, a district court "may adjust the benchmark when special circumstances indicate a higher or lower percentage would be appropriate." *In re Pac. Enters. Sec. Litig.*, 47 F.3d at 379 (citing *Six (6) Mexican Workers*, 904 F.2d at 1311). "Reasonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel*, 307 F.3d at 1007.

In the present case, Counsel requests "24.6% of the total Settlement, valued with programmatic relief at $23,500,000, as remuneration for costs <u>and</u> fees . . . ." (Att'y Fee Mot. 3.) This constitutes 29.6% of the Settlement Fund (i.e., without programmatic relief factored in), and a 3.5 multiplier of Counsel's lodestar of $1,709,841.30. (*Id.*; *see also* Notice of Errata and Correction to Pl.'s Att'y Fee Mot. 2, ECF No. 24.) Counsel further notes that the "multiplier will only decrease as Plaintiffs' Counsel continues to field calls from class members and monitors the settlement throughout the three-year term of the programmatic relief." (*Id.*)

In the present case, the Court determines that the percentage-of-the-fund calculation is preferable to the loadstar approach. *See, e.g.*, *Aichele v. City of L.A.*, No. CV1210863DMGFFMX, 2015 WL 5286028, at *5 (C.D. Cal. Sept. 9, 2015) ("Many courts and commentators have recognized that the percentage of the available fund analysis is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class, i.e., class counsel directly benefit from increasing the size of the class fund and working in the most efficient manner." (citations omitted)).

> Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6)

16-cv-01885-JLS-DHB

the risks of nonpayment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's lodestar.

*Id.* at *2 (citing *In re Heritage Bond Litigation*, No. 02-ML-1475 DT, 2005 WL 1594403, *18 (C.D. Cal. June 10, 2005); *In re Quintus Sec. Litig.*, 148 F.Supp.2d 967, 973–74 (N.D. Cal. 2001)).

As an initial matter, the Court agrees that the programmatic relief component of the settlement is tangible and substantial. However, our Circuit has explicitly counseled that "[p]recisely because the value of injunctive relief is difficult to quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund." Accordingly, "only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees." *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003). And in the present case, the Court simply cannot accurately ascertain the value of the prospective relief to each individual class member. Therefore, the Court will consider the requested fees only in light of the $19,500,000 common fund.

However, even considering the requested fees without including any monetary value for the substantial programmatic relief Counsel has secured, the Court concludes that Counsel's request for 29.6% of the common fund is reasonable.

In particular, the result obtained for the class is substantial. The amount of the Common Fund remaining after attorney-fee and class-incentive awards likely represents greater than 84% of the Classes' total lost base-pay compensation. (Final Approval Mot. 33.) And the programmatic relief, although hard to value precisely in strictly monetary terms, nonetheless provides for multiple layers of company-wide changes and independent review of the same, all specifically tailored to address the lasting discrimination alleged in this suit. This weighs in favor of increasing the benchmark by 4.6%.

Further, Counsel has expended tremendous effort in resolving this case favorably, thoroughly, and expeditiously. This, to date, includes over 3,084 attorney and staff hours

in pursuing the proposed settlement, and included multiple rounds of pre-suit negotiations, information exchanges, and mediations. Further Counsel has been nationally recognized both by courts and various industry groups as being highly skilled and experienced in class action employment cases. (Att'y Fee Mot. 15–17.) Accordingly, all factors regarding Counsel's activity in this case weigh in favor increasing the benchmark by 4.6%.

Additionally, as the Court has previously noted, the issues in this case are complex insofar as successfully proving legally cognizable employment discrimination can often be difficult. (Prelim. Settlement Order 14–15.) And Counsel points to the fact that discrimination-based class actions are especially risky and usually require greater pre-suit discovery given the Supreme Court's recent "heightening of the commonality standard . . . ." (Att'y Fee Mot. 17–18 (collecting sources).) This in turn somewhat merges into the risk of nonpayment assumed by Counsel who, here, have thus far represented Plaintiffs on a contingency-fee basis for one-and-a-half years. And the extensive pre-suit negotiations, data exchanges, and mediations indicate that Class Counsel has expended great time and care in pursuing settlement of this case, therefore "ha[ving] to forego other potential lucrative opportunities, while assuming the risk that it might not be compensated at all for its representation." (*Id.* at 19.) Accordingly, all these factors further weigh in favor of increasing the benchmark by 4.6%.

Further, although thirteen class members have requested exclusion, and four filed objections, this only constitutes approximately 0.49% of the overall class. And, notably, no Class Member objected to the requested award of attorney fees. This near-unanimous class approval and absence of fee-specific objections also weighs in favor of settlement. *See, e.g.*, *Singer*, 2010 WL 2196104, at *9 (noting that 33.33% fee request was "especially" warranted "in light of the fact that not a single class member objected to Plaintiff's counsel's" request).

Finally, the lodestar cross-check of 3.5 in this case is reasonable, especially in light of the risks identified above regarding bringing a discrimination suit of this magnitude. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) (approving multiplier of

16-cv-01885-JLS-DHB

3.65); *id.* n.6 (citing appendix "finding a range of 0.6–19.6, with most (20 of 24, or 83%) from 1.0–4.0 and a bare majority (13 of 24, or 54%) in the 1.5–3.0 range[,]" and noting that "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied . . . ." (citation omitted)).

Given the foregoing, the Court **CONCLUDES** that Counsel's requested attorney fees of $5,781,069.50 are reasonable and therefore **GRANTS** Plaintiffs' Attorney Fee Motion in this regard.

Additionally, Counsel moves for costs pursuant to case law, as well as 42 U.S.C. § 2000e-5(k), Federal Rule of Civil Procedure 23(h), and 28 U.S.C. § 1920. (Att'y Fee Mot. 23–24.) Counsel's costs entail: (1) 16,768.50 in expert costs; (2) $1,006 in filing and service fees, (3) $21,500 in mediation services, and (4) $29,656.00 for travel and meal expenditures. The Court **CONCLUDES** that all of these costs are validly recoverable and therefore **GRANTS** Plaintiffs' Attorney Fee Motion in this regard. *See, e.g.*, *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (noting an attorney usually may recover "out-of-pocket expenses that 'would normally be charged to a fee paying client' " and holding that facts of the case demonstrated the reasonableness of costs for "service of summons and complaint, service of trial subpoenas, fee for defense expert at deposition, postage, investigator, copying costs, hotel bills, meals, messenger service and employment record reproduction"); 42 U.S.C. § 2000e-5(k) (expressly providing for recovery of expert costs); *see also In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1178 (S.D. Cal. 2007) (concluding that "mediation expenses in this case are both reasonable and necessary" and collecting cases awarding fees for mediation expenses).

## CLASS SERVICE AWARDS

The Ninth Circuit recognizes that named plaintiffs in class action litigation are eligible for reasonable incentive payments. *Staton*, 327 F.3d at 977. The district court must evaluate each incentive award individually, using " 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in

pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation.' " *Id.* (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)). This individualized inquiry naturally means that "a court need not award all named plaintiffs the same incentive payment." *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *17 (N.D. Cal. Sept. 2, 2015).

In the present case, Plaintiffs seek a $50,000.00 award for each of the seven Class Representatives. (*See* Att'y Fee Mot. 25.) Plaintiffs argue that "[i]n employment cases such as this, courts regularly award service payments similar to or greater than those requested here." (*Id.* at 27.) However, this slightly overstates the regularity with which courts award incentive payments of this magnitude. In particular, the cases that grant awards as significant as those requested in the present case are typically "mega-fund" cases with overall settlement values approaching hundreds of millions of dollars. *See, e.g.*, *Weeks v. Kellogg Co.*, No. CV 09-08102 MMM RZX, 2013 WL 6531177, at *35 (C.D. Cal. Nov. 23, 2013) (approving $5,000 settlement awards for class representatives in case with Settlement Fund of $2,500,000.00 and noting that "[t]he only cases in which an incentive payment greater than that requested in this case has been approved involved much larger settlement funds"); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015) (authorizing $80,000.00 and $120,000.00 service awards in case with $415,000,000.00 settlement fund and collecting similar "mega-fund" cases); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (reducing sole $100,000.00 reward request to $50,000.00 in case with Settlement Fund of $76,723,213.26); *see also Scovil v. FedEx Ground Package Sys., Inc.*, No. 1:10-CV-515-DBH, 2014 WL 1057079, at *6 (D. Me. Mar. 14, 2014) ("A 2006 study of incentive awards during 1993–2002 (374 cases) found that the median incentive payment then was $4,357, and the average $15,992. . . . . The 2006 study, however, recognized that awards in employment discrimination cases are higher. . . . . Recent cases reflect that distinction in not only employment discrimination cases but also in wage and

hour cases, where recently awards of $10,000 and $15,000 are not uncommon and on occasion reach $20,000, $30,000 and higher." (citations omitted)).

However, the Court concludes that the facts of this case establish that a $50,000.000-per-Class-Representative award is reasonable. In particular, there is no doubt that in the present case the Class Representatives have helped secure substantial relief for the class, and that the Class Representatives' fears of workplace retaliation are real and substantial. *See, e.g.*, *Scovil*, 2014 WL 1057079, at *6. And even though the Representatives' Declarations reveal disparate time totals, (Haluza Decl. ¶ 13 (493 hours), ECF No. 21-4; Pan Decl. ¶ 13 (414 hours), ECF No. 21-3; Paquin Decl. ¶ 13 (295 hours), ECF No. 21-6; Shi Decl. ¶ 15 (259 hours), ECF No. 21-7; Matulich Decl. ¶ 14 (149 hours), ECF No. 21-8; Jacobson Decl. ¶ 15 (134 hours), ECF No. 21-9; Dealy Decl. ¶ 13 (70 hours), ECF No. 21-5), the services provided to the class outlined in each Declaration are largely the same. The Court sees no reason to base a discretionary departure solely on time spent when services provided and results obtained are nearly identical. Finally, and importantly, there have been no Class Member objections to the service awards, thus further indicating that the request of $50,000 per Class Representative appears reasonable to those who would have greatest awareness of the value and sacrifices made by the Class Representatives. Accordingly, the Court in its discretion determines that the requested Service Awards, while high, are nonetheless reasonable on the facts of this particular case.

Given the foregoing, the Court **GRANTS** Plaintiffs' Attorney Fee Motion regarding Class Representative Service Awards.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** in its entirety both Plaintiffs' Final Approval Motion and Attorney Fee Motion.

**IT IS SO ORDERED.**

Dated: July 31, 2017

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

26